## CALDERON, WARDEN *v.* COLEMAN

No. 98–437.   Decided December 14, 1998

evidence.

d.

PER CURIAM.

After a jury trial in a state court in California, respondent Russell Coleman was convicted of the September 5, 1979,

rape, sodomy, and murder of Shirley Hill. The jury's two special circumstances findings of rape and sodomy made Coleman death-penalty eligible under California law. See *People* v. *Coleman*, 46 Cal. 3d 749, 756–757, 759 P. 2d 1260, 1264 (1988).

At the penalty phase of Coleman's trial, the trial judge gave the jury a so-called Briggs instruction, then required by California law, which informed the jury of the Governor's power to commute a sentence of life without possibility of parole to some lesser sentence that might include the possibility of parole. After giving the standard Briggs instruction, the state trial court instructed the jury that it was not to consider the Governor's commutation power in reaching its verdict. Thus, the full jury instruction on commutation was as follows:

> "You are instructed that under the State Constitution, a Governor is empowered to grant a reprieve, pardon or commutation of a sentence following conviction of the crime.
>
> "Under this power, a Governor may in the future commute or modify a sentence of life imprisonment without the possibility of parole to a lesser sentence that would include the possibility of parole.
>
> "So that you will have no misunderstandings relating to a sentence of life without possibility of parole, you have been informed generally as to the Governor's commutation modification power. You are now instructed, however, that the matter of a Governor's commutation power is not to be considered by you in determining the punishment for this defendant.
>
> "You may not speculate as to if or when a Governor would commute the sentence to a lesser one which includes the possibility of parole.
>
> "I instruct you again that you are to consider only those aggravating and mitigating factors which I have already

read to you in determining which punishment shall be imposed on this defendant." Respondent's Opposition to Motion to Amend Petition for Writ of Habeas Corpus in No. C89–1906 (ND Cal.), p. 7, Record, Doc. No. 267, quoting Tr. 1059–1060.

In an unrelated case, we had upheld the Briggs instruction against a federal constitutional challenge. *California* v. *Ramos,* 463 U. S. 992 (1983). On direct appeal, however, Coleman argued that giving the Briggs instruction in his case was reversible error under the California Supreme Court's decision in *California* v. *Ramos,* 37 Cal. 3d 136, 689 P. 2d 430 (1984). There the California Supreme Court held, on remand from this Court, that the Briggs instruction violates the California Constitution because, in the California Supreme Court's view, it is misleading, invites the jury to consider irrelevant and speculative matters, and diverts the jury from its proper function.

The California Supreme Court rejected Coleman's argument and upheld his death sentence. *People* v. *Coleman,* *supra.* While the court found that the giving of the Briggs instruction was error under California law, it held the error was not prejudicial because the additional instruction told the jury it should not consider the possibility of commutation in determining Coleman's sentence. *Id.,* at 780–781, 759 P. 2d, at 1281–1282.

Coleman then sought a federal writ of habeas corpus. Although the District Court acknowledged this Court's holding that giving the Briggs instruction does not violate the Federal Constitution and does not mislead or inappropriately divert the jury, the court nonetheless granted the writ as to Coleman's death sentence. No. C89–1906 (ND Cal., Mar. 28, 1997), App. to Pet. for Cert. A–146, A–151. Relying on recent Ninth Circuit precedent, the District Court found the Briggs instruction was inaccurate as applied to Coleman because it did not mention a limitation on the Governor's power to commute Coleman's sentence. *Id.,* at A–

144

147. Under the California Constitution, the Governor may not commute the sentence of a prisoner who, like Coleman, is a twice-convicted felon without the approval of four judges of the California Supreme Court. Art. 5, §8.

The District Court found that, because the Briggs instruction did not mention this limitation on the Governor's commutation power, it violated the Eighth and Fourteenth Amendments by "g[iving] the jury inaccurate information and potentially divert[ing] its attention from the mitigation evidence presented." No. C89–1906, *supra*, at A–151. The court also found that, in the context of the case—particularly, the prosecutor's arguments of future dangerousness, "the commutation instruction would likely have prevented the jury from giving due effect to Coleman's mitigating evidence." *Id.*, at A–149. The court did not in express terms consider the effect of the additional instruction, which instructed the jury not to consider commutation, but it noted that the Ninth Circuit had held in a similar case, *Hamilton v. Vasquez*, 17 F. 3d 1149 (1994), "that the trial court did not cure the error by instructing the jury not to consider commutation." No. C89–1906, *supra*, at A–148.

The Court of Appeals for the Ninth Circuit affirmed the District Court's grant of the writ as to Coleman's sentence. 150 F. 3d 1105 (1998). The Court of Appeals agreed with the District Court's finding that the instruction, as applied to Coleman, gave the jury inaccurate information about the Governor's commutation power. *Id.*, at 1118. And, in a sweeping pronouncement, the court declared, "[a] commutation instruction is unconstitutional when it is inaccurate." *Ibid.* The instruction at issue was fatally flawed, the court held, because it "dramatically overstate[d] the possibility of commuting the life sentence of a person such as Coleman" (by creating "the false impression that the Governor, acting alone," could commute the sentence) and thus prevented the jurors from "understand[ing] the choice they [we]re asked to make" and "'invited [them] to speculate' that Cole-

man could be effectively isolated from the community only through a sentence of death." *Id.*, at 1119.

Having concluded that the giving of the instruction was constitutional error, the Court of Appeals then took up the State's argument that, even if the instruction was unconstitutional, it "did not have a 'substantial and injurious effect or influence' on the jury's sentence of death," *ibid.*, as required by *Brecht* v. *Abrahamson*, 507 U. S. 619, 637 (1993). The court explained:

> "To decide this question, we look to *Boyde* v. *California*, 494 U. S. 370 (1990). When the inaccuracy undermines the jury's understanding of sentencing options, 'there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.' *Boyde*, 494 U. S. at 380.
>
> "We conclude the district court did not err in holding that Coleman was denied due process by the state trial court's inaccurate commutation instruction." 150 F. 3d, at 1119 (citations omitted).

Though the Court of Appeals' constitutional analysis of the jury instruction, and the Circuit precedent on which it relied, have not been approved by this Court, we do not consider the validity of that analysis here because the State has not asked us to do so. We will simply assume at this stage that the instruction did not meet constitutional standards. The State does contend, however, that the Court of Appeals erred by failing to apply the harmless-error analysis of *Brecht*. We agree.

We held in *Brecht* that a federal court may grant habeas relief based on trial error only when that error "'had substantial and injurious effect or influence in determining the jury's verdict.'" 507 U. S., at 637 (quoting *Kotteakos* v. *United States*, 328 U. S. 750, 776 (1946)). This standard reflects the "presumption of finality and legality" that attaches

to a conviction at the conclusion of direct review. 507 U. S., at 633. It protects the State's sovereign interest in punishing offenders and its "good-faith attempts to honor constitutional rights," *id.*, at 635, while ensuring that the extraordinary remedy of habeas corpus is available to those "'whom society has grievously wronged,'" *id.*, at 634 (quoting *Fay* v. *Noia*, 372 U. S. 391, 440–441 (1963)).

A federal court upsets this careful balance when it sets aside a state-court conviction or sentence without first determining that the error had a substantial and injurious effect on the jury's verdict. The social costs of retrial or resentencing are significant, and the attendant difficulties are acute in cases such as this one, where the original sentencing hearing took place in November 1981, some 17 years ago. No. C89–1906, App. to Pet. for Cert. A–101, n. 45. The State is not to be put to this arduous task based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error. *Brecht, supra,* at 637. As a consequence, once the Court of Appeals determined that the giving of the Briggs instruction was constitutional error, it was bound to apply the harmless-error analysis mandated by *Brecht.*

The *Boyde* test that the Court of Appeals applied instead is not a harmless-error test at all. It is, rather, the test for determining, in the first instance, whether constitutional error occurred when the jury was given an ambiguous instruction that it might have interpreted to prevent consideration of constitutionally relevant evidence. *Boyde* v. *California*, 494 U. S. 370, 377, 380 (1990). In such cases, constitutional error exists only if "there is a reasonable likelihood" that the jury so interpreted the instruction.

Although the *Boyde* test for constitutional error, like the *Brecht* harmless-error test, furthers the "strong policy against retrials years after the first trial where the claimed error amounts to no more than speculation," 494 U. S., at 380, it is not a substitute for the *Brecht* harmless-error test.

The *Boyde* analysis does not inquire into the actual effect of the error on the jury's verdict; it merely asks whether constitutional error has occurred. If the Court of Appeals had viewed the jury instruction as ambiguous on the issue whether the Governor had the power alone to commute defendant's sentence, it might have inquired—as in *Boyde*—whether there was a reasonable likelihood that the jury understood the instruction as stating the Governor had that power. If the court found that possibility to be a reasonable one, it would determine then whether the instruction, so understood, was unconstitutional as applied to the defendant. Even if the court found a constitutional violation, however, it could not grant the writ without further inquiry. As the Court has recognized on numerous occasions, some constitutional errors do not entitle the defendant to relief, particularly habeas relief. See, *e. g., Brecht, supra,* at 637–638; *O'Neal* v. *McAninch,* 513 U. S. 432, 435–436 (1995) (applying harmless-error review to an instruction that "violated the Federal Constitution by misleading the jury"). The court must find that the error, in the whole context of the particular case, had a substantial and injurious effect or influence on the jury's verdict.

The motion of respondent for leave to proceed *in forma pauperis* and the petition for a writ of certiorari are granted, the judgment of the Court of Appeals for the Ninth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

Busy appellate judges sometimes write imperfect opinions. The failure adequately to explain the resolution of one issue in an opinion that answers several questions is not a matter of serious consequence if the decision is correct. In this case, there might have been a slight flaw in the Court of

Appeals' brief explanation of why the invalid instruction given to the jury was not harmless, but, as I shall explain, the court's ruling was unquestionably correct.

The State does not challenge the conclusion that the jury was given an unconstitutional instruction. It merely argues that this trial error should not "command automatic reversal . . . without application of the harmless error test of *Brecht v. Abrahamson*, 507 U. S. 619 (1993)."[1] And respondent Coleman does not contend that *Brecht* is inapplicable. He merely argues that the Court of Appeals actually performed the *Brecht* inquiry, albeit in an expedited fashion. Thus, the only controversy before this Court is whether the Court of Appeals was faithful to *Brecht*, and sufficiently explicit in its adherence.

Three aspects of the *Brecht* test for harmless error are significant here: (1) The test requires the reviewing judge to evaluate the error in the context of the entire record; (2) it asks whether the constitutional trial error at issue had a "'substantial and injurious effect or influence in determining the jury's verdict,'" *Brecht*, 507 U. S., at 637 (quoting *Kotteakos* v. *United States*, 328 U. S. 750, 776 (1946)); and (3) if the judge has grave doubt about whether the error was harmless, the uncertain judge should conclude that the error affected the jury's deliberations and grant relief, see *O'Neal* v. *McAninch*, 513 U. S. 432 (1995).

In this case, it is undisputed that both the District Court and the Court of Appeals made a thorough examination of the entire record. The District Court's 117-page opinion carefully analyzed each of the respondent's nonfrivolous attacks on his conviction and concluded that the judgment of guilt should stand. With respect to the death penalty, however, the District Judge decided that the inaccurate and misleading instruction describing the Governor's com-

---

[1] Pet. for Cert. i.

mutation power was unconstitutional and "would likely have prevented the jury from giving due effect to Coleman's mitigating evidence."[2]   Although the judge did not

[2] App. to Pet. for Cert. 149.   The District Court concluded more fully: "Coleman was entitled, under the Eighth and Fourteenth Amendments, to a sentencing jury that could fairly review the evidence he presented to show that he should not be sentenced to death.   *See e. g., Boyde* [v. *California*, 494 U. S. 370, 377–378 (1990)]; *Lockett* [v. *Ohio*, 438 U. S. 586, 605 (1978)].   Considered in light of the prosecution argument, the aggravating evidence and the record as a whole, the commutation instruction would likely have prevented the jury from giving due effect to Coleman's mitigating evidence.   *See Hamilton* [v. *Vasquez*, 17 F. 3d 1149, 1163 (CA9), cert. denied, 512 U. S. 1220 (1994)]; *cf. Boyde*, 494 U. S. at 370.

"Believing that the governor could, single-handedly, render Coleman eligible for parole, for example, the jury would have found it difficult to give 'a reasoned moral response' to testimony about Coleman's temper and his history of incarceration that was introduced to explain his behavior. *See Hamilton*, 17 F. 3d at 1160.   During its deliberation, the jury requested a copy of Coleman's prior felony convictions, which [suggests] that it gave them considerable weight.   RT 1068–72.   Yet the instruction prevented the jury from learning that Coleman's prior convictions not only weighed against him in aggravation but also made parole considerably less likely.   *See* [*California* v. *Ramos*, 463 U. S. 992, 1008 (1983)] (penalty-phase jury may consider many factors in determining whether death is the appropriate punishment); *see also Penry* [v. *Lynaugh*, 492 U. S. 302, 324 (1989)] (penalty-phase instruction unconstitutionally allowed jury to give aggravating, but not mitigating, effect to evidence of petitioner's mental retardation).

"The need for accurate parole-related instructions is heightened when the prosecution argues the issue of a defendant's future dangerousness. *See Simmons* [v. *South Carolina*, 512 U. S. 154, 164 (1994)] (due process violated when trial court refused to give accurate parole-eligibility instruction to rebut prosecution's argument about future dangerousness). Here, the prosecutor built his penalty-phase case around Coleman's prior felonies and his propensity for violence, both in and out of prison.   His closing argument, in particular, told the jury that Coleman 'has already demonstrated what he is capable of doing on numerous occasions to each and every one of us. . . . He is manipulative, he is dangerous to all of us.' RT 1011–12, 1029–30; *see Simmons*, [512 U. S., at 157] (prosecutor alluded to future dangerousness by arguing that death sentence would be 'a re-

use the exact words that this Court used in its opinions in *Kotteakos, Brecht,* and *O'Neal,* it is perfectly clear that he was convinced that the instruction had a "substantial and injurious effect" on the jury's deliberations. This conclusion is reinforced by the statement of a juror explaining how the invalid instruction had, in fact, affected the jury's deliberations.[3]

Because there is no reason to believe that the District Court's evaluation of the impact of the invalid instruction was incorrect, it is not surprising that the Court of Appeals affirmed without writing extensively about the harmless-error issue. It reasoned, in brief, that if there was a reasonable likelihood that the jury had applied an invalid instruction in a way that prevented the consideration of constitutionally relevant evidence, the error necessarily satisfied the *Brecht* test. Instead of spelling out its rea-

---

sponse of society to someone who is a threat[']); *Hamilton,* 17 F. 3d at 1162 (prosecutor argued that [Hamilton] would be 'conniving and devising ways to manipulate the system and get out[']). This argument may have caused the jury to speculate about the possibility that Coleman would be released if he were not sentenced to death.

"Because the instruction, in the context of Coleman's penalty-phase proceeding, gave the jury inaccurate information and potentially diverted its attention from the mitigation evidence presented, his death sentence violates the Eighth and Fourteenth Amendments: 'The jury in this case deliberating under these instructions could not have made the constitutionally mandated reasoned and informed choice between a sentence of life imprisonment without possibility of parole and a sentence of death.' *See Hamilton,* 17 F. 3d at 1164." *Id.,* at 149–151 (footnote omitted).

[3] "[A]ccording to juror Verda New, the possibility of parole was a much discussed topic in deciding whether respondent should live or die:

'[The jurors] openly discussed that Russell Coleman would be released from prison unless we sentenced him to death. Several jurors stated that he could be paroled if we sentenced him to life in prison. . . . Many of the jurors expressed their fear that if we failed to sentence Mr. Coleman to death, the courts or the Governor could allow him to be released from prison. This was the most significant part of our discussions regarding the appropriate penalty.'" Brief in Opposition 7.

soning at length, it merely cited an earlier en banc decision of the Ninth Circuit that came to a similar conclusion. See *McDowell* v. *Calderon*, 130 F. 3d 833, 838 (1997), cert. denied, 523 U. S. 1103 (1998).[4]

Perhaps there may be cases in which a more detailed and written analysis of the harmless-error issue should precede an appellate court's decision to affirm a trial court's conclusion that an unconstitutional jury instruction in a capital sentencing proceeding was not harmless. But even if that be true, there are three good reasons for not requiring the Court of Appeals to take a second look at the issue in this case.

---

[4] Although this Court's *per curiam* opinion quotes the relevant paragraph from the opinion below, see *ante*, at 145, the Court inadvertently omits the citation to *McDowell* that explained the Court of Appeals' reasoning. In *McDowell*, the en banc court stated:

"The question, then, is whether this fundamental error had any 'substantial and injurious effect or influence' on the jury's sentence of death, *Brecht* v. *Abrahamson*, 507 U. S. 619, 637 (1993) (quoting *Kotteakos* v. *United States*, 328 U. S. 750, 776 (1946)). To answer this question, we look for specific guidance to *Boyde* v. *California*, 494 U. S. 370 (1990). In *Boyde*, the Supreme Court confronted a claim that an arguably ambiguous jury instruction 'restrict[ed] impermissibly a jury's consideration of relevant [penalty phase] evidence. . . .' To evaluate such a claim, the Court fashioned a reviewing yardstick which we find appropriate here: 'The proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents consideration of constitutionally relevant evidence.' *Id.* at 380. If the answer is 'yes,' the error necessarily satisfies the *Brecht* test for substantial and injurious error. . . . We conclude on these facts, in these circumstances, and in the light of controlling authority that the error did substantially injure and influence the jury's verdict." *McDowell* v. *Calderon*, 130 F. 3d, at 838 (footnote omitted).

Four judges dissented from *McDowell*'s conclusion that it was reasonably likely that the jury erred in their application of an instruction used in that case, see *id.*, at 841, but no judge took issue with the logic of the harmless-error analysis quoted above, see *id.*, at 842–843 (Thompson, J., dissenting); see also *id.*, at 843–845 (Kozinski, J., dissenting).

152

First, in the context of the entire record as analyzed by the District Court, the result here is correct. Second, a fair reading of THE CHIEF JUSTICE's opinion for the Court in *Boyde* v. *California*, 494 U. S. 370 (1990), indicates that the heightened "reasonable likelihood" standard endorsed in that case was intended to determine whether an instructional error "require[s] reversal." *Id.*, at 379, 380. There is little reason to question the soundness—at least in most applications—of the reasoning of the en banc opinion in *McDowell* on which the Court of Appeals relied in this case. Third, there is a strong interest in bringing all litigation, and especially capital cases, to a prompt conclusion. This Court's ill-conceived summary disposition will needlessly prolong this proceeding.

Whatever the shortcomings of the Court of Appeals' review, they surely are not so great as to warrant an expenditure of this Court's time and resources. This is especially so because our decision today is unlikely to change the result below. Ordinarily, we demand far more indication that a lower court has departed from settled law, or has reached an issue of some national significance, before we grant review. The purported error in this case does not satisfy that standard.

Accordingly, I would deny the petition for writ of certiorari and, therefore, respectfully dissent.